Melva A. CAVANAUGH, Betty J. Clay, Kathy E. Johnson, Mary Kay Kane, Joyce D. Seever and Cinda M. Weber, Plaintiffs,

v.

**BURLINGTON NORTHERN RAILROAD COMPANY, Defendant.**

Civil No. 3–94–332.

United States District Court,
D. Minnesota,
Third Division.

Sept. 30, 1996.

Michael H. Hennen, Friendswood, TX, and Ann E. Brose, Yaeger, Jungbauer, Barczak & Roe, Ltd., Minneapolis, MN, for plaintiffs.

Diane P. Gerth, Spence, Ricke & Thurmer, P.A., St. Paul, MN, for defendant.

### MEMORANDUM AND ORDER

DAVIS, District Judge.

### INTRODUCTION

Plaintiffs brought this action against their employer, defendant Burlington Northern Railroad Co., following an internal investigation of harassment and violent threats against one of their co-workers, throughout which plaintiffs were treated as the "prime suspects." After the investigation revealed that the co-worker herself was responsible for the threats, plaintiffs initiated this lawsuit alleging state law intentional torts of defamation, false imprisonment, and intentional infliction of emotional distress, as well as Federal Employers' Liability Act (FELA) claims. Before the Court are cross motions for summary judgment on the preemptive effect of the Railway Labor Act, 45 U.S.C. § 151, et. seq. (RLA) on plaintiffs' state law and FELA claims. Defendant, alternatively, moves for summary judgment on the grounds that FELA preempts plaintiffs' state law claims; that defendant enjoys a qualified privilege against plaintiffs' defamation claim; and/or that they are entitled to summary judgment as a matter of law on the merits of the remaining claims. For the foregoing reasons, plaintiffs' motion against preemption is granted and defendant's motion for summary judgment on the merits is granted in part and denied in part.

### BACKGROUND

In 1992, Debbie Glick joined the Data Validation and Control (DVC) department at Burlington Northern Railroad, a small unit in which plaintiffs were also employed. During the fall of that year, management learned that Glick was allegedly being subjected to some hostilities by her co-workers, stemming from the perception that she was a lesbian. Plaintiff Betty Clay expressed concerns about this to her supervisor, Judy Stedman. Gaye Lindfors Deposition, Defendant's Exh. F, p. 17. Further investigation by Burlington suggested that while more than one factor may have led to the animosity among the employees in the department, "they were certainly mad" at Glick. Id. at 22.

In early November, Glick began reporting that she was receiving threatening phone calls. She stated that she was told to "get off the job, lesbian." Id. at 24. She was informed that the caller(s) knew that she parked at the Galtier parking ramp, the implication of which was "threatening." Id. at 26. At this point, "Assets Protection," Burlington's private police and internal security unit, began investigating the matter.

Assets Protection installed a telephone trace on Glick's home phone, following which there were no more threatening phone calls. Glick also reported to both the St. Paul Police and Assets Protection her discovery of a

note taped to her patio door which warned, "Staying home will not make you safe. Get off the job, lesbian." *See* Ray Young Deposition, Defendant's Exh. J, pp. 40–41; Exh. A attached to Affidavit of Robert Borries. Later, Glick reported that a blue pickup truck had tried to run her off the road; a sign in the back window read, "Debbie are you getting the message?" Young Deposition at 44–45.

Because of the recurring employment theme of these incidents, coupled with the previous allegations of hostility from some of her co-workers, Assets Protection directed its efforts to the members of Glick's department. On November 23, 1992, a work day, plaintiffs were summoned to a conference room in their building. Plaintiffs were then individually interrogated by "special agents" regarding the threats Glick had reported. The plaintiffs remained under the supervision of the investigators for approximately six or seven hours. During this time, they were not permitted to leave unescorted, and a supervisor accompanied them on bathroom or cigarette breaks. While it is not clear precisely what words were used by the agents, plaintiffs generally allege that the agents stated to them that serious criminal offenses had occurred for which someone would face job termination, and that they believed that one or more of the plaintiffs was involved. Plaintiff's Exh. R., attached to Affidavit of Roberta Freeman. By the time the November 23, 1992 interviews were completed, one of the agents concluded that plaintiffs were not responsible for the threats, however, that impression was not conveyed to the plaintiffs. Monte Zillinger Deposition, Plaintiffs' Exh. B, p. 89; Young Deposition, Plaintiffs' Exh. C, p. 92.

During the interrogation, plaintiffs were directed not to discuss the investigation among themselves or with anyone else. That evening, Glick reported a personal threat made to her in which she was told, "if anybody loses their job besides you, you will spend the holidays in the hospital." Young Deposition, Defendant's Exh. J, p. 50. Assets Protection viewed this threat as a violation of their confidentiality directive, and therefore re-interrogated the plaintiffs on November 24, 1992, although for a much shorter time.

Later it was discovered that Glick herself was in fact responsible for the threats. During the Thanksgiving weekend, Assets Protection agents stationed at Glick's house discovered apparent similarities between her handwriting and that which appeared on the threatening notes. After handwriting analysis confirmed this, Glick confessed to the hoax. She agreed to undergo counseling and perform community service, and Glick remains a Burlington Northern employee.

This litigation is the direct result of that hoax. Plaintiffs allege three state law intentional torts stemming from the Glick investigation: defamation, false imprisonment, and intentional infliction of emotional distress. Plaintiffs' complaint also includes claims of negligent supervision and training; negligent infliction of emotional distress; and intentional infliction of emotional distress in violation of Federal Employers' Liability Act, 45 U.S.C. § 51, *et seq.* (FELA).

## DISCUSSION

### I. Summary Judgment Standard

Summary Judgment is warranted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine as to any material fact and that the moving party is entitled to summary judgment as a matter of law." Fed.R.Civ.P. 56(c). The Court determines materiality from the substantive law governing the claim. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Disputes over facts which might affect the outcome of the lawsuit according to applicable substantive law are material. Once the moving party presents a properly supported motion, the burden shifts to the non-moving party to demonstrate the existence of a genuine dispute. A material fact dispute is "genuine" if the evidence is sufficient to allow a reasonable jury to return a verdict for the non-moving party. 477 U.S. at 248–49, 106 S.Ct. at 2510–11.

## II. RLA Preemption

■ Defendant argues that plaintiffs' state tort and federal FELA claims are preempted by the Railway Labor Act, 45 U.S.C. § 151 *et seq.* (RLA). Defendant claims that plaintiffs have erroneously recharacterized their "minor" disputes, within the meaning of the RLA, as independent state law causes of action. Because such "minor" disputes are subject to mandatory arbitration pursuant to the parties' collective bargaining agreement (CBA), defendant argues that this Court lacks subject-matter jurisdiction over plaintiffs' claims. Defendant further contends that since plaintiffs intended, yet failed, to timely pursue their complaints under the CBA, they are barred from recovery altogether.

In their cross motion for partial summary judgment on preemption, plaintiffs argue to the contrary, relying primarily on *Hawaiian Airlines, Inc v. Norris,* 512 U.S. 246, 114 S.Ct. 2239, 129 L.Ed.2d 203 (1994) wherein the Supreme Court substantially narrowed the scope of RLA preemption of state law claims. Plaintiffs contend that both their state tort and federal FELA claims provide "substantive rights independent of the [CBA]" and thus survive RLA preemption under the new, restrictive *Norris* standard. *Id.* at ———— ————, 114 S.Ct. at 2247–2249; *see also Taggart v. Trans World Airlines, Inc.,* 40 F.3d 269 (8th Cir.1994) (post-*Norris* holding that RLA did not preempt plaintiff's state law discrimination claim); *Atchison, T. & S.F.R. Co. v. Buell,* 480 U.S. 557, 107 S.Ct. 1410, 94 L.Ed.2d 563 (1987) (pre-*Norris* holding that RLA did not preempt FELA claim for failure to provide safe workplace). Plaintiffs' argument is compelling.

■ The RLA was enacted "to promote stability in labor-management relations by providing a comprehensive framework for resolving labor disputes." *Norris* at ———, 114 S.Ct. at 2243, (*citing Buell,* 480 U.S. at 562, 107 S.Ct. at 1413–14). The Act sets forth mandatory bargaining, mediation, and arbitration procedures to handle two classes of disputes involving collective bargaining agreements. 45 U.S.C. §§ 151–163, 181–188. The first class are "major" disputes which concern "rates of pay, rules of working condi-

tions." "Major" disputes involve "the formulation of collective bargaining agreements or efforts to secure them." *Norris* at ———, 114 S.Ct. at 2243 (citation omitted). Of import in this case is the second class or "minor" disputes which "gro[w] out of grievances or out of the interpretation or application of agreements covering rates of pay, rules or working conditions." *Buell* at 563, 107 S.Ct. at 1414. "Minor" disputes involve " 'controversies over the meaning of an existing collective bargaining agreement in a particular fact situation.' " *Norris* at ———, 114 S.Ct. at 2243, (*quoting Trainmen v. Chicago R. & I.R.Co.,* 353 U.S. 30, 33, 77 S.Ct. 635, 636–37, 1 L.Ed.2d 622 (1957)). Thus, "major disputes seek to create contractual rights, minor disputes to enforce them." *Id.* (citation omitted).

Defendant argues that plaintiffs' state law tort claims are "grievances" under Rule 58 of the relevant CBA and should have been pursued as such under the terms of the agreement. Rule 58, in pertinent part, provides:

GRIEVANCES

An employee who considers himself otherwise unjustly treated shall have the same right of hearing and appeal as provided for by Rule 56, provided written request is made to his immediate superior within fifteen (15) calendar days of knowledge by the employee of the cause of the complaint.

Exhibit P, attached to Affidavit of Diane Gerth. Rule 59 of the same agreement requires that all claims or grievances be raised in writing within 60 days of the date of the occurrence on which the claim or grievance is based. *Id.* Defendant contends that plaintiffs' complaints about the manner in which it conducted the Glick investigation amount to an untimely "Rule 58" grievance about unjust treatment in the terms and conditions of employment. Since the claims involve the "interpretation or application" of the CBA (i.e. Rule 58), they fall within the scope of the RLA's exclusive arbitration provisions. We disagree.

■ As previously stated, the RLA's arbitral mechanism only preempts state law claims that are grounded in an existing CBA. Thus,

[T]he critical question is of characterization—does the state law claim involve interpretation or application of the collective bargaining agreement or, stated another way, is the state law claim independent of the collective bargaining agreement.

*Taggart*, 40 F.3d at 272 (interpreting *Norris*). "Substantive rights independent of the collective bargaining agreement and causes of action to enforce such rights are not preempted by the RLA." *Id.*, (*citing Norris* at ——, 114 S.Ct. at 2246). The standard is whether " 'purely factual questions' about an employee's conduct or an employer's conduct and motives" require a court to interpret any term of the CBA. *Norris* at ——, 114 S.Ct. at 2248. If no interpretation of, or substantive reference to, the CBA is necessary, the claim is not preempted. This is so even where the resolution of the state law claim and the grievance under the collective bargaining agreement involve "the same factual inquiry." *Id.* at —— ——, 114 S.Ct. at 2248-49, (*quoting Lingle v. Norge Division of Magic Chef, Inc.*, 486 U.S. 399, 108 S.Ct. 1877, 100 L.Ed.2d 410 (1988)).

In this case, we are unpersuaded by defendants' argument that plaintiffs' claims involve the "interpretation or application" of Rule 58 of the CBA. Rather, plaintiffs' claims turn on just the sort of "purely factual inquiry," wholly apart from any provision of the CBA, that precludes RLA preemption. *Id.* at ——, 114 S.Ct. at 2245. Defendant correctly notes that plaintiffs did attempt to file a grievance concerning their complaints about the Glick investigation before filing this lawsuit. *See* Plaintiff's Exh. R. Defendant heavily relies on that undisputed fact as support for their preemption argument. Plaintiffs' belief, accurate or not, that the CBA provided them with an avenue of relief, is not dispositive of whether the RLA preempts their state tort claims, as a matter of law. For preemption to apply, defendant must identify some aspect of the CBA which relates to plaintiffs' claims. It has simply failed to do so. Plaintiffs' allegations, however rooted they may be in the mechanics of defendant's investigation procedures, do not amount to "minor" disputes over the enforcement of contractually-bargained rights.

To the contrary, the Court finds that as in *Buell, Norris,* and *Taggart,* plaintiffs' rights (the right to not be defamed, falsely imprisoned, or intentionally inflicted with emotional distress, etc.) arise independently by operation of state common law and federal statutory law. This fact places them outside the scope of grievances contemplated by the RLA preemption scheme. Moreover, even if defendant had identified a term of the CBA which relates to plaintiffs' claims, the Supreme Court has made clear that "the existence of a potential CBA-based remedy d[oes] not deprive an employee of independent remedies available under state law." *Norris* at ——, 114 S.Ct. at 2249 (*citing Lingle,* 486 U.S. at 408, 108 S.Ct. at 1882-83).

In other words, even if dispute resolution pursuant to collective-bargaining agreement, on the one hand, and state law, on the other, would require addressing precisely the same set of facts, as long as the state-law claim can be resolved without interpreting the agreement itself, the claim is 'independent' of the agreement for § 301 preemption purposes.

*Id.* (*quoting Lingle* at 408-410, 108 S.Ct. at 1882-84).[1] For the foregoing reasons, the Court finds that the RLA does not preempt plaintiffs' state tort or FELA claims. Plaintiffs' motion for partial summary judgment on RLA preemption is thus granted, defendant's motion on the same is denied.

## III. FELA Pre-emption

■ Defendant alternatively argues, without the benefit of controlling authority, that plaintiffs are barred from bringing their state law intentional tort actions because FELA is the sole and exclusive remedy available to railroad employees for workplace-related injuries. Defendant's argument fails under *Pikop v. Burlington Northern RR. Co.,* 390 N.W.2d 743 (Minn.1986) cert. denied, 480 U.S. 951, 107 S.Ct. 1616, 94 L.Ed.2d 800 (1987).

---

1. *Lingle* involved a § 301 of the LMRA, 29 U.S.C. § 185, preemption claim. The *Norris* court explicitly adopted that court's framework as the standard to be applied in cases involving RLA preemption. *Id.* at —— ——, 114 S.Ct. at 2247-48.

In *Pikop,* the Minnesota Supreme Court specifically addressed the FELA's pre-emptive effect on a state law claim for intentional infliction of emotional distress. After a detailed analysis of the FELA's legislative history and the limited number of cases that have allowed intentional tort recovery under the FELA, the *Pikop* court held that plaintiff's intentional tort claim "lies outside the scope of [FELA], which was enacted to compensate only physical injuries resulting from negligence." *Id.* at 755. The holding in *Pikop* is equally applicable to the facts in this case. Because the analysis in *Pikop* is both thorough and sound, we see no need to reiterate it here. *Id.* at 753–755. For the reasons set forth in *Pikop v. Burlington Northern RR. Co.,* defendant's motion on the FELA's pre-emptive effect on plaintiffs' intentional tort claims is denied.

## IV. Defamation & Qualified Privilege

Defendant moves for summary judgment on plaintiffs' defamation claim on the grounds that any defamatory statements that were made during the course of the Glick investigation are privileged as a matter of law. For a statement to be considered defamatory, it must be communicated to a third party, be false, and tend to harm the plaintiff's reputation in the community and to lower her in the estimation of the community. *Stuempges v. Parke Davis, & Co.,* 297 N.W.2d 252, 255 (Minn.1980). A defendant may escape liability for a defamatory statement based upon a qualified privilege. Minnesota law "recognizes a qualified privilege which exempts an employer from liability for defamatory statements about an employee so long as the statements are made in good faith and for a legitimate purpose." *Keenan v. Computer Associates Intern. Inc.,* 13 F.3d 1266, 1269 (8th Cir.1994) (*citing Brooks v. Doherty, Rumble & Butler,* 481 N.W.2d 120, 124–25 (Minn.Ct.App.1992)) (internal citation omitted). In order to be privileged,

> [The] communication ... must be made upon a proper occasion, from a proper motive, and must be based upon reasonable or probable cause. When so made in good faith, the law does not imply malice from the communication itself ... Actual

malice must be proved, before there can be a recovery, and in the absence of such proof the plaintiff cannot recover.

*Id.* (*quoting Stuempges,* 297 N.W.2d at 256–57).

The qualified privilege analysis thus involves a two-step inquiry. First, the defendant bears the burden of establishing the existence of the privilege by proving that the communication was: (1) made upon a proper occasion, (2) made from a proper purpose, and (3) based upon reasonable and probable grounds. *Id.* Whether the employer had a proper purpose and whether an occasion is a proper one upon which to recognize a privilege are always questions of law for the court to decide. *Id.* at 1270 (*citing Brooks,* 481 N.W.2d at 125). Generally, the question of whether the employer had reasonable and probable grounds for making the statement is also one of law for the court, "unless the evidence 'permits of more than one conclusion,' then the question becomes one of fact for the jury." *Id.* (*quoting Brooks* (*citing Wirig v. Kinney Shoe Corp.,* 461 N.W.2d 374, 380 n. 4 (Minn.1990))).

If the defendant successfully establishes the privilege, the burden shifts to the plaintiff to show that the privilege was abused and thus lost. To carry its burden, the plaintiff must demonstrate that the defendant acted with actual malice. *Id.* (citations omitted) The malice question is one of fact for the jury to decide. *Id.* Malice has been defined as "actual ill will, or a design causelessly and wantonly to injure plaintiff." *Frankson v. Design Space, Intl.,* 394 N.W.2d 140, 144 (Minn.1986). The *Frankson* court noted that a finding of malice was properly sustained where there was "some evidence from which it might be inferred that the defendant knew of the falsity of some of the statements [and] * * * also some evidence of ill feeling between [defendant's employee] and plaintiff." *Id.* (*citing Froslee v. Lund's State Bank,* 131 Minn. 435, 155 N.W. 619, 620 (1915)).

> Malice may be proved by extrinsic evidence of personal ill feeling, or by intrinsic evidence such as the exaggerated language of the libel, the character of the language

used, the mode and extent of publication, and other matters in excess of the privilege.

*Id.* (citation omitted).

 In this case, defendant allegedly defamed plaintiffs by making statements that one or more of the plaintiffs were responsible and thus criminally culpable for the harassment and threats made to their co-worker, Debbie Glick. Defendant argues that because the statements were made during the course of a serious harassment investigation for the purpose finding the perpetrator, and based upon a reasonable belief and suspicion that one (or more) of the six plaintiffs were involved in making the threats, they are privileged. Defendant claims that absence a showing of malice, which plaintiffs have failed to do, they are entitled to summary judgment.

In response, plaintiffs argue that defendant is not entitled to the privilege or, in the alternative, that it lost any privilege it may have had because of the "reckless, unreasonable and imprudent" manner in which it conducted the Glick investigation. Plaintiffs contend that because defendant did not have any specific evidence that linked any of them to the incidents reported by Glick, defendant did not act upon proper occasion, with a proper motive, or with probable cause, so as to establish a qualified privilege for its defamatory statements. For the following reasons, the Court disagrees.

The allegedly defamatory statements were made within the context of an investigation into an employee's complaints of harassment of a discriminatory and threatening nature. In that context, defendant was ethically, if not legally, obligated to investigate Glick's complaints. *See e.g., Wirig v. Kinney Shoe,* 461 N.W.2d at 380–381. One of the plaintiffs herself acknowledges that defendants' agents "were just doing their job, I guess, finding out." Plaintiff Cinda Weber Deposition, Defendant Exh. K., p. 128. Defendant's statements were made in furtherance of a legitimate investigation and, therefore, were made upon a proper occasion and generally from a proper purpose. *See Keenan* at 1269.

Next, it must be determined whether defendant's statements were based upon reasonable or probable grounds. Plaintiffs argue that defendant did not have probable grounds to target and investigate them in the harsh manner in which it did, to the exclusion of other possible suspects, including Glick herself. Plaintiffs object to the reckless manner in which the investigation was conducted and the inappropriateness and unreasonableness of certain actions (or inactions) by the defendant and its agents. *See e.g.,* Young Deposition, Plaintiffs' Exh. C, pp. 41–42 (threatening notes not fingerprinted until after plaintiffs were interviewed); *Id.* at 43–44 (door on which threatening note attached not fingerprinted); *Id.* at 19–22, 47–48 and Borries Deposition, Plaintiffs' Exh. H, pp. 32–34 (agents' inaction concerning pickup truck allegation and incident). Plaintiff also relies on a report by a security consultant and proposed expert witness that reiterates that the manner in which defendant conducted the Glick investigation was "lax" and in some ways "contrary to acceptable practices." Sweeney Report, Plaintiffs' Exh. I.

Plaintiffs' criticisms of defendant's investigation, although relevant to their defamation claim (as discussed below), do not undermine a finding of probable grounds for the making of the statements. Moreover, plaintiffs' argument against probable cause inevitably rests on a material fact that was not known nor reasonably suspected during most of the investigation—that Glick herself, and not anyone else, was responsible for the threats. Plaintiffs' suggestion that defendant should have known then, what we all know now, is not supported by the record. Nor does the evidence show that it was unreasonable for defendant to have considered plaintiffs as possible suspects, as plaintiffs contend. The record shows, as defendant notes, that Glick was a long-time employee with an unblemished employment history; there was no reason for defendant to believe that she was orchestrating a hoax. In addition, Glick's behavior throughout the investigation appeared to be that of an actual victim: she took time off from work, reported the incidents to the police, and went so far as leaving town in order to allow defendant to stake out her house in order to catch the perpetrator.

The record also supports an inference, which the defendant's agents apparently drew, that plaintiffs were probably involved or at least that it was reasonable to look upon one or more of them as "primary suspects." It is undisputed that defendant was already checking into allegations that some of the plaintiffs harbored hostility towards Glick at the time that the threatening calls began. Moreover, plaintiffs admit that there was mistrust and anger towards Glick in the department. *See* Mary Kaye Kane Deposition, Defendant's Exh. C., p. 40; Kathy Johnson Deposition, Defendant's Exh. D., p. 174. Within that context, it was not unreasonable for defendant to proceed with a notion in mind that plaintiffs' ill will toward Glick may have escalated into more serious and aggressive conduct. The Court, therefore, finds that defendant's alleged defamatory statements were based on reasonable or probable cause and thus enjoy a qualified privilege as a matter of law.

■ However, just as defendant has carried its burden to establish the privilege, plaintiffs have shouldered theirs, at this stage in the litigation, by demonstrating that a genuine fact dispute exists concerning actual malice, which if established undermines defendant's privilege. It is at this point that some of plaintiffs' arguments concerning the manner in which defendant conducted the Glick investigation become relevant. *See Frankson* at 144 ("Malice may be proved by ... personal ill will, ... exaggerated language, ... the character of the language used.") For example, the length that plaintiffs were interrogated; the harshness or manner in which defendants' questioned the plaintiffs; the fact that plaintiffs were not allowed to go to the restroom without supervision; the fact that one of the agents concluded after the first day of interrogations that plaintiffs were not involved yet they were re-interrogated the next day; and management's alleged predisposed ill will towards some of the plaintiffs, all raise fact questions that may support a finding of malice. That determination, however, must be made by a jury, not the Court. *See e.g.,* Thronsedt Deposition, Plaintiffs' Exh. K, pp. 25–26; Glance Deposition, Plaintiffs' Exh. J, pp. 32, 93. Defendant's motion for summary

judgment on plaintiffs' defamation claim is thus denied.

## V. Remaining Claims

Finally, defendants seek summary judgment on the merits of plaintiffs' remaining state claims of false imprisonment and intentional infliction of emotional distress, and federal FELA claims.

### A. False Imprisonment

■ The tort of false imprisonment has three elements: 1) words or acts intended to confine a person; 2) actual confinement; and 3) awareness by the person that he or she is confined. *Eilers v. Coy,* 582 F.Supp. 1093, 1096 (D.Minn.1984), (*citing Blaz v. Molin Concrete Products Co.,* 309 Minn. 382, 244 N.W.2d 277, 279 (1976)). Viewing defendants' actions on November 23 and 24, 1992 in the light most favorable to the non-movant, plaintiffs' have, at a minimum, raised material fact issues regarding the elements of this claim. *See* Plaintiffs' Exh. R. Consequently, defendant's motion on the false imprisonment claim is denied.

### B. Intentional Infliction of Emotional Distress

■ Plaintiffs claim that the reckless nature by which defendant conducted the entire Glick investigation coupled with egregious actions during the November 23 and 24, 1992 interrogations establish a common law claim of intentional infliction of emotional distress. Construing all of the evidence before the Court in their favor, plaintiffs have not shown "extreme and outrageous" conduct necessary to establish a claim of intentional infliction of emotional distress. The conduct giving rise to this sharply limited tort must be "so atrocious that it passes the boundaries of decency and is utterly intolerable to the civilized community." *Hubbard v. United Press International, Inc.,* 330 N.W.2d 428, 438–39 (Minn.1983). Even if the Court were to conclude that defendant acted recklessly or even maliciously towards plaintiffs, the conduct before us is not beyond human decency. Accordingly, defendant's motion for summary judgment on plaintiffs' state law

882

claim of intentional infliction of emotional distress is granted.

### C. FELA Claims

In their complaint, plaintiffs allege three claims under FELA: negligent supervision and training; negligent infliction of emotional distress; and intentional infliction of emotional distress. Defendant moves for summary judgment on each.

#### 1. Failure to Supervise

In their complaint, plaintiffs make a number of allegations concerning defendant's negligence in training and supervising its managers and Assets Protection agents. Plaintiffs, however, offer no evidence nor do they cite to any case law to support their claims. Moreover, defendant apparently misinterpreted plaintiffs' complaint as raising a negligent hiring and retention claim and thus argues issues in its moving papers that, likewise, do not address the supervision and training issues now before the court.

Although on summary judgment, the Court views the evidence in favor of the nonmoving party and gives that party the benefit of every justifiable inference that may be drawn from that evidence, "an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but * * * must set forth specific facts showing that there is a genuine issue for trial." *Krenik v. County of Le Sueur*, 47 F.3d 953, 957 (8th Cir.1995). The nonmoving party may not simply argue that operative facts will be subsequently developed which will support its claim either. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986). Because plaintiffs have offered no evidence to support their FELA-based negligent supervision and training claim, defendant's motion for summary judgment is granted.

#### 2. Negligent Infliction of Emotional Distress

Plaintiffs also raise a negligent infliction of emotional distress claim under FELA. In a recent case, *Consolidated Rail Corporation v. Gottshall*, 512 U.S. 532, 114 S.Ct. 2396, 129 L.Ed.2d 427 (1994), the Supreme Court held that recovery for negligent infliction of emotional distress is available under FELA, a question that was previously unresolved after *Buell*. After a lengthy analysis, the Court concluded "[w]e therefore hold that, as part of its 'duty to use reasonable care in furnishing its employees with a safe place to work," [citing *Buell*], a railroad has a duty to use reasonable care in furnishing its employees with a safe place to work. *Id.* at ——, 114 S.Ct. at 2408. The Court went on to adopt the "zone of danger" test as the standard to be applied to negligent infliction of emotional distress claims. That test, the Court, concluded "best reconciles the concerns of the common law principles underlying our FELA jurisprudence." *Id.* at ——, 114 S.Ct. at 2410.

Under the test, "a worker within the zone of danger of physical impact will be able to recover for emotional injury caused by fear of physical injury to himself, whereas a worker outside the zone will not." *Id.* at ————, 114 S.Ct. at 2410–11. Plaintiff has failed to establish any material facts to satisfy the "zone of danger" test set forth in *Gottshall*. Defendant's motion for summary judgment on plaintiffs' claim of FELA-based negligent infliction of emotional distress is granted.

#### 3. Intentional Infliction of Emotional Distress

The holding in *Gottshall* is clear: a claim of negligent infliction of emotional distress is cognizable under FELA. The question of whether FELA provides a similar remedy for claims of intentional infliction of emotional distress, however, remains debatable. *Gottshall* at ——, n. 2, 114 S.Ct. at 2403, n. 2.

Although a few courts have found that FELA covers intentional torts, *see e.g., Lancaster v. Norfolk and Western Ry.*, 773 F.2d 807, 812–13 (7th Cir.1985) cert. denied, 480 U.S. 945, 107 S.Ct. 1602, 94 L.Ed.2d 788 (1987) (pre-*Buell* case finding FELA covers intentional torts provided they are marked by physical contact or threat of physical contact), *cert. denied*, 480 U.S. 945, 107 S.Ct. 1602, 94 L.Ed.2d 788 (1987); *Teague v. Na-*

*tional R.R. Passenger Co.*, 708 F.Supp. 1344, 1351 (D.Mass.1989) (holding that FELA covers claim of intentional infliction of emotional distress), plaintiffs' claims, in those cases, involved both emotional and physical injury. That is not the case here—plaintiffs' complaint rests on allegations of purely emotional injuries; there was no physical harm or threat to physically harm the plaintiffs during the investigation. To this Court's knowledge the FELA has not been applied to claims of intentional emotional distress lacking in a physical dimension. While the Supreme Court has yet to address the question, we agree with the emerging line of cases that have excluded intentional torts under FELA resulting from purely emotional injuries. *See Hammond v. Terminal R.R. Ass'n of St. Louis*, 848 F.2d 95 (7th Cir.1988) *cert. denied*, 489 U.S. 1032, 109 S.Ct. 1170, 103 L.Ed.2d 229 (1989) (rejecting FELA damages claim for purely emotional injury as result of harassment because FELA claims require physical contact or threat of physical contact), *Adkins v. Seaboard System R.R.*, 821 F.2d 340, 342 (6th Cir.1987) *cert. denied*, 484 U.S. 963, 108 S.Ct. 452, 98 L.Ed.2d 392 (1987) (claim for intentional infliction of emotional distress not cognizable under FELA based on allegation of intentional act of conspiracy to terminate plaintiff). We believe this result is consistent with the reasoning in *Buell, Gottshall* and others that recognize and reflect on the FELA's original intent of covering physical injuries resulting from negligent conduct. As one court noted, "*Buell* did not contemplate allowing recovery for emotional anguish whenever an employee who is accused, falsely or otherwise, of a serious workplace offense." *See Feldleit v. Long Island Rail Road*, 723 F.Supp. 892, 900 (E.D.N.Y.1989). In this case, as in *Feldleit*, "there is ... no basis to conclude that plaintiffs were "subject to the type of unconscionable abuse which is a prerequisite to recover" for a purely emotional injury." *Id.* (*citing Buell* at 566 & n. 3, 13, 107 S.Ct. at 1416 & n. 13). Plaintiffs' FELA-based intentional tort claim is dismissed.

## ORDER

Accordingly, based upon the above, and all files, records, and proceedings herein, IT IS HEREBY ORDERED:

1. Plaintiffs' motion for partial summary judgment on the issue of RLA pre-emption is GRANTED; defendant's motion on the same is DENIED.

2. Defendants motion for summary judgment on plaintiffs' common law and FELA-based claims of intentional infliction of emotional distress, and plaintiffs' FELA claim of negligent training and supervision are GRANTED. Plaintiffs' claims are dismissed with prejudice.

3. Defendants' motion for summary judgment in all other respects is DENIED.